– AMENDMENT –

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FILED
SCRANTON

JUL 1 6 2019

PER _____
DEPUTY CLERK

JOSHUA HAMPTON,

          Plaintiff,   )

v.

G. Jones, Mr. Hoffman, Mr. Newheart,
[ ........ ] [ ........ ], Mr. Hicks,
Mr. Drick, J. Ayers (Nurse), and
Warden David J. Ebbert.

          Defendants.)

Civil Action No. 1:19-CV-751

FEDERAL CIVIL RIGHTS COMPLAINT
(BIVENS),
AND SUPPLEMENT COMPLAINT

---

### I.
### JURISDICTION

    This is a civil action brought pursuant to **Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics**, 403 U.S. 388 (1971). The Court has jurisdiction over this action pursuant to **Title 28 U.S.C §1331 and 2201.**

### II.
### PARTIES

    **A.** **PLAINTIFF:** Joshua T. Hampton, Inmate Number: 31575-160, Address: Federal Correctional Institution Jesup, 2680 Highway 301 South, Jesup, GA 31599.

### III.
### ADMINISTRATIVE REMEDIES PURSUANT TO THE BIVENS CLAIM

    **A.** Plaintiff filed his BP-8 Informal Resolution, BP-9 Administrative Remedy (Warden Level), BP-10 Remedy (Regional Level), and BP-11 Remedy (Central Office Level). See Exhibit copies of all grievances that were filed attached to complaint.

    **B.** **DEFENDANTS:** G. Jones, Mr. Hoffman, Mr. Newheart, [ _____ ] [ _____ ], Mr. Hicks, Mr. Drick, J. Ayers (Nurse), and Warden David J.Ebbert. These Defendants are sued in their "Individual Capacities" concerning the events described herein in this complaint.

1

## IV.
### DEFENDANTS

1. The United States is a Defendant and is sued in it's "Official Capacity" concerning the events described in this complaint, and in their "Individual Capacity" for violating Plaintiff's Eighth Amendment Rights.

## V.
### STATEMENT OF CLAIM UNDER THE (FTCA)

**Claim I:** Plaintiff Hampton brings this claim against the United States pursuant to **18** U.S.C §4042 (failure to protect from harm). Plaintiff will assert that the United States acting by and through prison officials caused him physical and mental harm by willfully threatening him to spray "Oil Based POLYURITHANE" on finished wood products such as: desks, tables, and prison officials' personal items. Plaintiff was given direct orders to use an "OIL BASED POLY SPRAYER", and if he did not comply, he would be written an incident report and sent to Solitary Housing Unit ("SHU"). Plaintiff's job/duty assignment was "never" to use a sprayer of any type, but his job duty was to build desks, tables, and personal items for prison staff members.

Plaintiff Hampton avers that he was given continual direct orders and threatened to use the sprayer to spray the OIL BASED POLYURITHANE from the relevant times of January 4, 2017 -through- July 23, 2018 (approximately 17 months), and within this time frame Plaintiff unknowingly contracted severe, serious damage to his lungs and respiratory restriction of air flow concerning his breathing process of **17%** air flow in and out. Plaintiff "may" have cancer from this overexposure to harsh and dangerous chemicals, but is not sure, due to the fact that F.B.O.P medical staff will not address the issue or give him the test to find out whether or not he has cancer from the extreme overexposure to the "POLY" chemical. Plaintiff further avers that the "POLY" chemical is, and was, the factual and proximate cause of the injuries that he has sustained and stated in this paragraph **(2)**.

## AMENDMENT TO ADD:

### Bivens Lawsuit Along With Supplemental Complaints

### Bivens Lawsuit to Run Parallel to Tort SF 95 Claim

**Claim I:** Violation of Eighth Amendment Right to Protection **(18 U.S.C §4042)** and Deliberate Indifference

**Claim II:** Violation of Eighth Amendment Right to Medical Care...By Nurse P.A. J. Ayers of U.S.P Lewisburg under Warden Ebbert of 2018.

---

**Claim I:** To involve every staff member of U.S.P Lew. named in the 5pg Affidavit along with all evidence included in SF 95 Tort Claim. CMS Staff: G. Jones GM-1, [_____], [_____], Mr. Newheart, and Mr. Hoffman.
Safety Staff: Mr. Hicks and Mr. Drick.

---

**Claim II:** Adding Supplemental Complaint. Please See 3pg Affidavit with Fact and Evidence sheets included in this Amendment and Supplemental Complaint...

**Claim II Part 2:** Elements. 7-11-2018 Medical Record proves that J. Ayers P.A. examined Claimant and treated him...See Treatment...Yet she failed to follow Due Process by protecting Claimant from exposure to known chemical ("MinWax Oil Base Poly) which she expressed that Claimant believes he has...ex See Medical Report.

Element 2: Deliberate Indifference by J. Ayers P.A.

Claimant states Exposure...J. Ayers P.A. states it in her Report and treats Claimant, yet she fails to inform Claimant that he is in Extreme Danger and Harmful Damage id he continues to be exposed to **Chemicals w/out Protection...**

Element 3: Deliberate Indifference ...J. Ayers P.A.

Then, without informing Safety of Chemical Exposure or by not filling out **OSHA 301 Injury Sheet**...She then sends Claimant back to work with clear knowledge that Claimant works as a Chemical Sprayer of MinWax OIL BASED POLY and that he will be exposed again to the harmful chemical...

Element 4: Because J. Ayers P.A. acted with Deliberate Indifference, by sending inmate Hampton (Claimant) back to work, she willingly and willfully exposed Claimant to Extreme Over Exposure to a Dangerous Chemical (MinWax OIL BASED POLY) and caused more harm to be done to Claimant's lungs and body, when J.Ayers P.A. could have placed Claimant on Medical Leave, thereby also causing mental torment and fear.

Joshua T Hampton
6-19-2019

4

**AFFIDAVIT**

I, Joshua Hampton #31575-160, so solemnly swear under the Penalty of Perjury, that the foregoing information is True and Correct to the best of my knowledge and belief...

On 7-11-18, while being housed at U.S.P Lewisburg, I was in the Big Spray Room spraying MinWax Oil Based Poly. Under Direct Orders of Officer G. Jones...At or around 9:00 a.m. I had an issue breathing. I panicked... due to the fact of the inability to breath... And I ran for the hallway door... At that point I knew that something was very wrong, so I went to Medical (the Clinic)... on the very next move. Against the Direct Orders that I'd been given by G. Jones and other staff members. Once at Medical, I was seen by Jessie Ayers, P.A. She inquired as to where I worked, at which time I told her (GM-1 The Workshop). She then asked me what my (Job Assignment) was. I informed her that I was the Polyurithain Sprayer, the one who sprayed the final coats on the (Wood Stuff for the Prison), such as desks, flag boxes, cornholers and all the stuff for the auction, along with personal frames and clock Towers for staff.

She then asked me how long I had been working. I told her 17-18 months. She then asked me how long I've had the breathing issue. I told her 2-3 months. She then asked me to blow into a long tester (Please see Medical Records). I then informed her about collapsing to my knees trying to breath before I panicked and ran for the hallway door while I was in the hallway experiencing a coughing episode and sneezing fit, where I began tasting something strange in my mouth like a chemical. She then asked me if I had a respirator-- in which I replied that I was never told by staff nor Safety that I needed one, nor was I ever issued one for the job. She then administered another test, prescribed me some pills (Prednisone 20mg), and then sent me back to work. At no time did she offer me a Lay-In from work, nor did she file the Chemical OSHA 301 Report, nor did she inform the Warden David, nor did she inform Safety about the use of sprayers w/out respirators. I then returned back to work and began working, which was spraying (MinWax Oil Based Poly).

1

On 7-23-18, I was taking Dr. Edinger his personal picture frames. I then informed him that I was still having chest discomfort, trouble sleeping, and migraine headaches almost everyday for 1 to 3 hours. He then asked me as to what I did in GM-1 other than make wooden desks and personal items for staff. I told him that I spray (MinWax Oil Based Poly). His very next question was, "Do you have a respirator?" I told him no, I never was informed by staff, nor Safety, nor Medical that I needed one. He then Gave me another more personal test. To my knowledge, he never reported it, but as of right now 6-3-19, I don't have all of my Prison Medical Records. It should be noted that Ms. Miose and P.A. Ayers were in and out of the testing room where Dr. Edinger was giving me a breathing test. This test started around 3 p.m. and ended just before the 4 p.m. count.

After the test, I Felt safe to tell Dr. Edinger about the threats of **BODILY HARM** from staff members (G. Jones, Supervisor) and Newheart), and the threat was that I would be beaten to the point where I needed more than just Medical if I ever reported the fact that they were using a spray-gun in a spray-booth.

Due to the threats by staff, I told Dr. Edinger that he needed to protect me from the staff and the Warden David Ebbert. He looked at me and told me that her would just put me on a Lay-In so "they" wouldn't know about my medical issues. Please see Dr. Edinger's Medical Report).

Now that I'm at F.C.I Jesup I have made my case known to the Medical Staff here, Safety, and Lt. Thomas, SIS. I've shown them the report from Medical along with picture evidence. They refused to allow me to make a Formal Complaint. The C.M.C lady, Ms. Chalfant and the Notary Public also refused to notarize any papers that I had, or picture evidence. I have not had any more treatment for my exposure to the chemical MinWaax Oil Based Poly. My symptoms have gotten worse and I have been to Medical 3 times. They refuse to take my statement about my lung issues. F.C.I Jesup due to the fact of retaliation by the Medical Staff and Custody.

At no time did Dr. Edinger report the threats made against me, nor did he ever report the Chemical Exposure, nor did he file an OSHA 301 Report. He also never tested me for the Chemical Exposure, knowing full well that I had (No Respirator) while spraying MinWax Oil Based Poly. Dr. Edinger also knew full well that the chemical was being Misused by being sprayed through a spray-gun.

Both Nurse Ayers and Dr. Edinger were both informed that I was spraying Poly, yet when given the opportunity, neither of these individuals (F.B.O.P Medical Staff) informed anyone of where claimant worked, nor did they inform anyone that I needed to be cleared by Medical in order to use such a spray-gun and chemicals such as MinWax Oil Based Polyurethane.

Jesup Medical Staff: AHSA-CDR Deleou
A. Griffis Nurse
L. Drury Nurse

B. AREMU

6-6-19    Joshua Hampton #31575-160

3

# Deliberate Indifference

**Element**
"MinWax" Oil Based Polyurithane, Used for Floors...

**Fast Proving Element**
7-11-18 Claimant suffered from a coughing/sneezing attack while tasting a chemical in his mouth from spraying chemical s by way of a paint sprayer with 8016 Air Psi...

**Known Evidence**
"MinWax" Floor Oil Based Polyurithane states on Caution Label: Intentional Misuse by deliberately concentrating and inhaling the contents can be harmful or fatal. This product is not meant to be used in an air sprayer or paint sprayer...See Attachment.


**CMS**
G. Jones of Woodshop GM-1

**Fast Proving Element**
Gave Claimant a direct order to spray Oil Based "MinWax" Poly on prison desks, Cornholes, and personal items for staff members over 5 times...

**Known Evidence**
Please See Exhibits...
G. Jones of GM-1 Woodshop

**Fast Proving Element**
Never gave Claimant the P.P.E gear to work with chemicals...The label on the can of "MinWax" Oil Based Poly states: Vapor Harmful to Eyes, Skin, and Respiratory Tract...

**Known Evidence**
Please See Exhibits... It is clear on the safety sheets that Claimant has to be cleared by Medical in order to use a Respirator.
G. Jones of GM-1 Woodshop

**Fast Proving Element**
Hired Claimant on 1-4-17 and Claimant worked through 7-23-18 (17 months) and he never did give Claimant Safety P.P.E Gear.

**Known Evidence**
Please See Medical Records...No Respirator Test...
G. Jones of GM-1 Woodshop

**Fast Proving Element**
Knew that the Chemical "MinWax" Polyurithane was harmful because he told Claimant to keep his back door shut because the fumes gave him headaches.

**Known Evidence**... Please See Picture of Taped Door.

1

# Deliberate Indifference

**Element**

G. Jones of GM-1 Woodshop

**Known Fact**

Gave Claimant direct orders to never say anything to anyone or Medical about the use of spraying Oil Based Poly...

**Evidence**

Please See Affidavit and statements from inmates Archer and Kirbby who also worked in GM-1 during the same time as Claimant.

Mr. Newheart, A.W. of CMS

**Known Fact**

Gave me a direct order to never say anything to anyone about the use of Air Spray Guns or the 2 spray booths if asked during inspections.

**Evidence**

Please See Witness' Statements and Claimant Affidavit...

Mr. Hoffman, Ass. A.W. of CMS

**Known Fact**

On or about Aug-Oct of 2017 during a "Prea Required" Inspection, He gave Claimant a direct order to "Not Speak of Spray Booths or Spray Guns"...

**Evidence**

Please See Witness' Statements and Claimant's Affidavit...

Mr. Hicks of Safety

**Known Fact**

Requested that Claimant build him personal Penn. State Cornholers, and to be sure that Claimant sprayed "Oil Based Poly" on them, and remember to never say anything about the Spray Booths or the Spray Guns.

**Evidence**

Please See Exhibits...

Mr. Drick of Safety

**Known Fact**

Gave Claimant a direct order to build him personal Cornholes along with the other staff. Inmate Archer and myself (Claimant) were already building for auction and to spray everything with "Oil Based Poly."

**Evidence**

Please See Pictures and Inmate Pay Sheets because inmate Archer and Claimant were being paid by Safety to build personal items for staff members...

*Deliberate Indifference*

Warden D. Ebbert

**Known Fact**

Also came down to pick up personal picture frames and once again told Claimant about the fact that "we don't spray Oil Based Poly on anything at U.S.P Lew."

**Evidence**

Known knowledge of Claimant being directed to spray "Oil Based Poly"...See Exhibits and Pictures, and witness' statements.

**Element**

Serious Medical Need

**Facts Proving Elemtent**

7-11-18 Claimant began coughing and sneezing and gasping for air...dizziness and the tasting of chemicals in Claimant's mouth.

**Known Evidence**

Health Services Clinical Encounter on 7-11-18 Provider: J. Ayers P.A., Jessie P.A.-C. Facility: USP Lewisburg

**Element**

Officials' Knowledge of Need

**Facts Proving Element**

7-11-18 Claimant told Health Services J. Ayers P.A. about spraying "Oil Based Poly". J. Ayers asked Claimant if he had a respirator. Claimant said "No"...J. Ayers did not give Claimant Medical Lay-In, but sent him back to work in the same conditions.

**Known Evidence**

7-11-18 to 7-23-18 Claimant had to continue working with "Oil Based Poly" until Dr. Edinger, Andrew MD/CD restricted him from GM-1 Woodshop.

**Failure to Provide Treatment**

J. Ayers P.A. provided Claimant with Prednisone 20mg, yet did nothing to prevent Claimant from being exposed further to "MinWax" Oil Based Polyurithane by placing Medical Lay-In on Claimant.

**Known Evidence**

P.A. J. Ayers' Clinical Encounter on 7-11-18



**Element**

Causation and Injury

**Facts Proving Element**

Because P.A. J. Ayers did not follow Due Process and acted with Deliberate Indifference.

**Known Evidence**

Claimant was sent back to work where he was again under orders to spray: "MinWax Oil Based Poly"... by doing so, J. Ayers P.A. personally carried out more injury and damage to Claimant causing pain and a mental state of Hopelessness and Extreme Fear...

6-19-19    Joshua T
           Hampton
           #31575-160



**U.S. Department of Justice**

Federal Bureau of Prisons   1:19cv751

*Northeast Regional Office*

*U.S. Custom House-7th Floor*
*2nd & Chestnut Streets*
*Philadelphia, PA 19106*

July 2, 2019

**FILED**
**SCRANTON**

JUL 1 6 2019

Joshua Hampton, Reg. No. 31575-160
FCI Jesup
2680 301 South
Jesup, GA 31599

Per _____

DEPUTY CLERK

  RE: Administrative Claim No. TRT-NER-2019-05068

Dear Mr. Hampton:

  Administrative Claim No. TRT-NER-2019-05068, received on
June 24, 2019, has been considered for settlement as provided by
the Federal Tort Claims Act, 28 U.S.C. § 2672, under authority
delegated to me by 28 C.F.R. § 543.30.  Damages are sought in
the amount of $10,000,000.00 based on a personal injury claim.
Specifically, you allege on July 11, 2018, you were injured
while performing a work assignment at USP Lewisburg.

  The proper remedy for an inmate work-related injury is the
Inmate Accident Compensation System as set forth in 18 U.S.C. §
4126 and 28 C.F.R. Part 301.  If you desire to file a claim
under the Inmate Accident Compensation System, you should
contact the Safety Manager at the institution where you are
confined to acquire the proper forms.  Under the provisions 28
C.F.R. Part 301.101, any claim for compensation should be
submitted at or near the time of release from confinement to:
Claims Examiner, Inmate Accident Compensation System, Federal
Prison Industries, Inc., Washington, DC 20534.  Accordingly, the
claim is denied.

  Additionally, per Program Statement 1320.06, <u>Federal Tort
Claims Act</u>, if you wish to file an Administrative Tort Claim
concerning your alleged personal injury at FCI Jesup, the claim
should be submitted to Craig Simmons, Regional Counsel,
Southeast Regional Office, Federal Bureau of Prisons, Bldg.
2000, 3800 Camp Creek Parkway, SW, Atlanta, Georgia 30331-6226,
the Regional Office where the alleged incident has occurred.
The attached Claim for Damage, Injury of Death (SF-95) may be
used in the instance of personal injury or wrongful death.

Joshua Hampton, Reg. No. 31575-160
July 2, 2019
Page 2

    If you are dissatisfied with this decision, you may bring
an action against the United States in an appropriate United
States District Court within six (6) months of the date of this
letter.

                            Sincerely,

                            Darrin Howard
                            Regional Counsel

cc:  David J. Ebbert, Warden, USP Lewisburg
     Craig Simmons, Regional Counsel, Southeast Regional Office

U.S. Department of Justice

Federal Bureau of Prisons

# Central Office Administrative Remedy Appeal

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: __Hampton, Joshua__      __31575-160__      __D-2__      __F.C.I Jesup-Red__

     LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION

**Part A - REASON FOR APPEAL** Mr. Hampton appeals the BP-9 Administrative Remedy and the BP-10 Regional Administrative Remedy on the basis that the Warden Level Remedy was rejected by the Administrative Remedy Coordinator on allegations that he filed at the wrong level. The Remdy Coordinator--Oliver and Freeman are blatantly abusing the BOP grievance process in an attempt to preclude Mr. Hampton from "properly" exhausting his Administrative Remedy Process. In the Supreme Court case Ross v. Blake, 136 S.Ct. 1850, 1856, 195 L. Ed. 2d 117 (2016), the Supreme Court reiterated, Section 1997(a) provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." As we have often observed, that language is "mandatory": An inmate "shall" bring "no action" (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies. Woodford v. Ngo, 548 U.S. 81, 85, 126 S.Ct. 2378, 165 L.Ed. 2d 368 (2006)("There is no question that exhaustion is mandatory under the PLRA, Ross v. Blake., Although the Court, in Ross, expressly recognized "the significant qualifier: the remedies must indeed be "available" to the prisoner', the Court stated that "aside from that exception, the PLRA's text suggests no limits on an inmate's obligation to exhaust irrespective of any 'special circumstances.'" (id.). The Supreme Court then listed: "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief. First, an administrative procedure is unavailable when it operates as a simple dead end--with officers unable or consistently unwillingly to provide any relief to aggrieved inmates. Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use--i.e., some mechanism exists to provide relief, but no ordinary prisoner can navigate it. And finally, a grievance process is rendered unavailable when prison administrators thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation. Id. at 1853-54.

_____        _Hampton Joshua_

DATE                                  SIGNATURE OF REQUESTER

**Part B RESPONSE**

_____

DATE                                         GENERAL COUNSEL

**ORIGINAL: RETURN TO INMATE**          CASE NUMBER: _____

**Part C - RECEIPT**

                                         CASE NUMBER: _____

Return to: _____

         LAST NAME, FIRST, MIDDLE INITIAL      REG. NO.      UNIT      INSTITUTION

SUBJECT: _____

_____                                                 

DATE                          SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

REJECTION NOTICE - ADMINISTRATIVE REMEDY

DATE: JANUARY 11, 2019


FROM: ADMINISTRATIVE REMEDY COORDINATOR
      JESUP FCI

TO  : JOSHUA HAMPTON, 31575-160
      JESUP FCI    UNT: D     QTR: D05-507U
      2600 HIGHWAY 301 SOUTH
      JESUP,  GA 31599


FOR THE REASONS LISTED BELOW, THIS ADMINISTRATIVE REMEDY REQUEST
IS BEING REJECTED AND RETURNED TO YOU. YOU SHOULD INCLUDE A COPY
OF THIS NOTICE WITH ANY FUTURE CORRESPONDENCE REGARDING THE REJECTION.


REMEDY ID       : 964650-F1    ADMINISTRATIVE REMEDY REQUEST
DATE RECEIVED   : JANUARY 10, 2019
SUBJECT 1       : SAFETY, SANITATION, ENVIRONMENTAL CONDITIONS
SUBJECT 2       :
INCIDENT RPT NO:


REJECT REASON 1: YOU SUBMITTED YOUR REQUEST OR APPEAL TO THE
                 WRONG LEVEL.  YOU SHOULD HAVE FILED AT THE
                 INSTITUTION,    REGIONAL OFFICE, OR CENTRAL
                 OFFICE LEVEL.

REJECT REASON 2: SEE REMARKS.

REMARKS         : COMPENSATION CLAIMS SHOULD BE ADDRESSED USING THE
                  TORT CLAIM PROGRAM.

Causation Effect
Retaliation + amendment

REJECTION NOTICE - ADMINISTRATIVE REMEDY

DATE: MAY 7, 2019

FROM: ADMINISTRATIVE REMEDY COORDINATOR
SOUTHEAST REGIONAL OFFICE

TO  : JOSHUA HAMPTON, 31575-160
JESUP FCI     UNT: D     QTR: D05-509L
2600 HIGHWAY 301 SOUTH
JESUP,  GA 31599

F.C. I. Jesup
WARDEN'S OFFICE
MAY 2 2 2019
RECEIVED ON

FOR THE REASONS LISTED BELOW, THIS REGIONAL APPEAL
IS BEING REJECTED AND RETURNED TO YOU. YOU SHOULD INCLUDE A COPY
OF THIS NOTICE WITH ANY FUTURE CORRESPONDENCE REGARDING THE REJECTION.

REMEDY            : 954632-R1          REGIONAL APPEAL
DATE RECEIVED     : JANUARY 24, 2019
SUBJECT 1         : SAFETY, SANITATION, ENVIRONMENTAL CONDITIONS
SUBJECT 2         :
INCIDENT RPT NO:

REJECT REASON 1: CONCUR WITH RATIONALE OF REGIONAL OFFICE AND/OR INSTITUTION
                 FOR REJECTION. FOLLOW DIRECTIONS PROVIDED ON PRIOR REJECTION
                 NOTICES.

REMARKS           FOLLOW TORT CLAIM PROCEDURES.

U.S. Department of Justice

**Central Office Administrative Remedy Appeal**

Federal Bureau of Prisons

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-229(13) and BP-230(13), including any attachments must be submitted with this appeal.

From: __Hampton, Joshua__    __31575-160__    __D-2__    __FCI JESUP__
     LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

**Part A - REASON FOR APPEAL** Mr. Hampton appeals the BP-9 Administrative Remedy and the BP-10 Regional Administrative Remedy on the basis that the Warden Level Remedy was rejected by the Administrative Remedy Coordinator on allegations that he filed at the wrong level. The Remedy Coordinator - Oliver and Freeman are blatantly abusing the BOP grievance process in a attempt to preclude Mr. Hampton from "properly" exhausting his Administrative Remedy Process. In the Supreme Court case Ross v. Blake, 136 S. Ct. 1850, 1856, 195 L. Ed. 2d 117 (2016). The Supreme Court reiterated, Section 1997e(a) provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." As we have often observed, that language is "mandatory": An inmate "shall" bring "no action" (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies. Woodford v. Ngo, 548 U.S. 81, 85, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006)("There is no question that exhaustion is mandatory under the PLRA, Ross v. Blake. Although the Court, in Ross, expressly recognized "one significant qualifier: the remedies must indeed be "available"

__June 7, 2019__    (see continuation page)    _Hampton Joshua_
     DATE                                         SIGNATURE OF REQUESTER

**Part B - RESPONSE**

_Star-2_

_____                                _____
     DATE                                    GENERAL COUNSEL

ORIGINAL: RETURN TO INMATE              CASE NUMBER: _____

**Part C - RECEIPT**

                                       CASE NUMBER: _____

Return to: _____
       LAST NAME, FIRST, MIDDLE INITIAL        REG. NO.        UNIT        INSTITUTION
SUBJECT: _____

_____                                    _____
     DATE                                    SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL

BP-231(13)

REJECTION NOTICE - ADMINISTRATIVE REMEDY

DATE: JANUARY 24, 2019


FROM: ADMINISTRATIVE REMEDY COORDINATOR
      JESUP FCI

TO  : JOSHUA HAMPTON, 31575-160
      JESUP FCI     UNT: D    QTR: D05-507U
      2600 HIGHWAY 301 SOUTH
      JESUP,  GA 31599


FOR THE REASONS LISTED BELOW, THIS ADMINISTRATIVE REMEDY REQUEST
IS BEING REJECTED AND RETURNED TO YOU. YOU SHOULD INCLUDE A COPY
OF THIS NOTICE WITH ANY FUTURE CORRESPONDENCE REGARDING THE REJECTION.


REMEDY ID      : 965484-F1      ADMINISTRATIVE REMEDY REQUEST
DATE RECEIVED  : JANUARY 23, 2019
SUBJECT 1      : REQUESTS FOR MONETARY COMPENSATION
SUBJECT 2      :
INCIDENT RPT NO:

REJECT REASON 1: YOU SUBMITTED YOUR REQUEST OR APPEAL TO THE
                 WRONG LEVEL.   YOU SHOULD HAVE FILED AT THE
                 INSTITUTION,  REGIONAL OFFICE, OR  CENTRAL
                 OFFICE LEVEL.

REJECT REASON 2: SEE REMARKS.

REMARKS        : COMPENSATION CLAIMS MUST BE SUBMITTED THROUGH THE
                 THE TORT CLAIM PROCESS.

REJECTION NOTICE - ADMINISTRATIVE REMEDY

DATE: APRIL 23, 2019

*J J*

FROM: ADMINISTRATIVE REMEDY COORDINATOR
SOUTHEAST REGIONAL OFFICE



TO  : JOSHUA HAMPTON, 31575-160
JESUP FCI     UNT: D    QTR: D08-810L
2600 HIGHWAY 301 SOUTH
JESUP,  GA 31599

FOR THE REASONS LISTED BELOW, THIS REGIONAL APPEAL
IS BEING REJECTED AND RETURNED TO YOU. YOU SHOULD INCLUDE A COPY
OF THIS NOTICE WITH ANY FUTURE CORRESPONDENCE REGARDING THE REJECTION.

REMEDY ID       : 965484-R1          REGIONAL APPEAL
DATE RECEIVED   : FEBRUARY 4, 2019
SUBJECT 1       : REQUESTS FOR MONETARY COMPENSATION
SUBJECT 2       :
INCIDENT RPT NO:

REJECT REASON 1: CONCUR WITH RATIONALE OF REGIONAL OFFICE AND/OR INSTITUTION
                 FOR REJECTION. FOLLOW DIRECTIONS PROVIDED ON PRIOR REJECTION
                 NOTICES.

REJECT REASON 2: SEE REMARKS.

REMARKS         : YOU MUST USE THE TORT CLAIM PROCESS TO SUBMIT CLAIMS
                  FOR MONETARY DAMAGE NOT THE ADMIN REMEDY PROCESS

| | | | |
|---|---|---|---|
| Inmate Name: HAMPTON, JOSHUA | | | Reg #: 31575-160 |
| Date of Birth: 10/04/1979 | Sex: M Race: BLACK | | Facility: LEW |
| Encounter Date: 07/11/2018 10:14 | Provider: Ayers, Jessie PA-C | | Unit: H02 |

Mid Level Provider - Sick Call Note encounter performed at Health Services.

**SUBJECTIVE:**

> **COMPLAINT 1**    Provider: Ayers, Jessie PA-C
>
> **Chief Complaint:** Breathing Problems
> **Subjective:** Inmate states he has been "more aware of his breathing over the last 2 weeks and is getting concerned because he does not feel like he can take a deep breath and has been waking up feeling short of breath". Inmate states he works with chemicals at his job and isn't sure if he inhaled something he shouldn't have.
> **Pain:** No

**OBJECTIVE:**
**Respirations:**

| Date | Time | Rate Per Minute | Provider |
|---|---|---|---|
| 07/11/2018 | 10:49 LEW | 16 | Ayers, Jessie PA-C |

**Wright Peak Flow:**

| Date | Time | Attempt 1 | Attempt 2 | Attempt 3 | Effort | Bronchodilator | Provider |
|---|---|---|---|---|---|---|---|
| 07/11/2018 | 10:49 LEW | 250 | 275 | 200 | Fair | Without | Ayers, Jessie PA-C |

**SaO2:**

| Date | Time | Value(%) | Air | Provider |
|---|---|---|---|---|
| 07/11/2018 | 10:49 LEW | 98 | Room Air | Ayers, Jessie PA-C |

**Exam:**
**General**
> **Affect**
>> Yes: Pleasant, Cooperative
>
> **Appearance**
>> Yes: Appears Well, Alert and Oriented x 3
>> No: Appears Distressed

*[handwritten note:]* She Allowed me to keep working And Spraying Chemical oil BASE Poly.

**Eyes**
> **General**
>> Yes: Extraocular Movements Intact

**Pulmonary**
> **Observation/Inspection**
>> No: Respiratory Distress
>
> **Auscultation**
>> No: Crackles, Wheezing

**Cardiovascular**
> **Observation**
>> Yes: Within Normal Limits
>
> **Auscultation**
>> Yes: Regular Rate and Rhythm (RRR), Normal S1 and S2

## ASSESSMENT:

Unspecified abnormalities of breathing, R069 - Current

## PLAN:

### New Medication Orders:

| Rx# | Medication | Order Date | Prescriber Order |
|-----|-----------|-----------|-----------------|
| | predniSONE Tablet | 07/11/2018 10:14 | Orally(1)  60 mg -  daily x 3 day(s) -- *** (2)  40 mg -  daily x 3 day(s) -- *** (3)  20 mg -  daily x 3 day(s) -- |

Indication:  Unspecified abnormalities of breathing

### New Radiology Request Orders:

| Details | Frequency | End Date | Due Date | Priority |
|---------|-----------|----------|----------|----------|
| General Radiology-Chest-2 Views | One Time | | 07/12/2018 | Routine |

Specific reason(s) for request (Complaints and findings):

shortness of breath

### Disposition:

Follow-up at Sick Call as Needed

### Other:

Chest X-ray obtained today. Inmate started on oral steroids to see if this improves his symptoms. If symptoms continue or worsen will place order for sleep study and possible PFT for new onset asthma/COPD.

Patient allergies reviewed and updates applied during this visit if indicated. See Chart: Allergies for most recent patient allergy list.

### Patient Education Topics:

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|----------------|--------|---------------|----------|---------|
| 07/11/2018 | Counseling | Plan of Care | Ayers, Jessie | Attentive |

Copay Required: No          Cosign Required:  No

Telephone/Verbal Order:  No

Completed by Ayers, Jessie PA-C on 07/11/2018 10:55

G. Jones Back Door to His office... He told me to tape it w/ Green
Paint Tape. B/c the Fumes & Vapors Gave Him Head Aches And made HIM feel
Sick



My Work Space before Luther!
As You can see 2 rolls

SAW The Color Prints
The Copys

Jesup G.A.
Joshua F Hampton  31575-160
Punishment By Law  Abdule

Nathaniel Zimmerman
18277-021
4/27/19

6-19-19 Joshua T Hampton

# MINWAX®

### SUPER FAST DRYING

# POLYURETHANE

# FOR Floors

### 350 V.O.C. Compliant

## PROFESSIONAL FORMULA

**Superior Durability for Hardwood Floors**

- *Provides a traditional amber tone to the floor*
- *No sanding between coats.*



RECOAT IN 8 HOURS

## GLOSS

1 U.S. GAL (3.78L)

**WARNING! COMBUSTIBLE!** VAPOR HARMFUL! IRRITATES EYES, SKIN AND RESPIRATORY TRACT. Before using, carefully read CAUTIONS on back panel.

6-6-19 Joshua & Hampton

## Minwax® Super Fast-Drying Polyurethane for Floors — Interior Use Only

Minwax® Super Fast-Drying Polyurethane for Floors is a clear, oil-based, durable protective finish specifically formulated for hardwood floors. It is a long lasting protection and beauty provides a traditional, amber tone to the floor, and does not require sanding between coats!

- **Superior durability for hardwood floors.**
- **Optimized drying technology results in a faster recoat time between coats.**
- **No sanding required between coats. Complete entire project in one day!**
- **Advanced anti-settling formula ensures less stirring and fewer highs and lows across large surfaces, resulting in an even sheen.**

### Directions for a beautiful hardwood floor finish:

**WARNING:** Removal of old paint by sanding, scraping or other means may generate dust or fumes that contain lead. Exposure to lead dust or fumes may cause brain damage or other adverse health effects, especially in children or pregnant women. Controlling exposure to lead or other hazardous substances requires the use of proper protective equipment, such as a properly fitted respirator (NIOSH approved) and proper containment and cleanup. For more information, call the National Lead Information Center at 1-800-424-LEAD (in US) or contact your local health authority.

#### STEP 1: SAND THE FLOOR

Whether you have a bare wood floor, or a wood floor that already has a finish on it, you will need to sand the floor to prepare it for finishing. Rent or purchase a floor sander. Follow the sander manufacturer's directions to prepare your floor.

You will need to sand the floor down to bare wood if:
- You'd like to change the color of your floor, or
- Your floor's finish is cracking, peeling, or completely worn away in areas, or
- Shellac, lacquer, wax, or products containing stearates have been applied to the floor.

You can do a "screen and recoat" if:
- You do not want to change the color of your floor, and
- Your existing finish is in good condition, with no chipping, peeling, or worn through areas, and
- Shellac, lacquer, wax, or products containing stearates have not been applied to the floor.

For a "screen and recoat", there is no need to remove your existing floor finish. Instead, you can simply "screen" the existing finish to prepare it for the addition of new finish. For all floors, follow the sander manufacturer's directions for your type of project. Remove all sanding dust.

#### STEP 2: APPLY MINWAX® WOOD FINISH™ STAIN (OPTIONAL)

If you have sanded the floor down to bare wood, or you have a new, unfinished wood floor, and you'd like to add color to it, you can stain the floor. Sand and prepare the floor according to the sander manufacturer's directions, ending with 100 grit sandpaper or equivalent. Remove all dust. Apply Minwax® Wood Finish™ Stain following the directions on the Wood Finish stain label. Wait 8-12 hours (according to the directions on the Wood Finish Stain label) for the stain to dry, and then apply Minwax® Super Fast-Drying Polyurethane for Floors.

#### STEP 3: APPLY MINWAX® SUPER FAST-DRYING POLYURETHANE FOR FLOORS

- Before use, thoroughly stir Minwax® Super Fast-Drying Polyurethane for Floors to rotate the product from the bottom to the top of the can. You will not need to stir again if the project will be completed in one day.
- Apply a thin coat using a lambswool or synthetic pad applicator, or a natural bristle brush.
- Maintain a wet edge to avoid lap marks.
- Allow the finish to dry 6-8 hours, but less than 10 hours. If this timing is followed, no sanding between coats is needed! But if you have let the finish dry for more than 10 hours, sand the finish lightly with 220 grit sandpaper. Allow 8 hours dry time before you sand.
- Apply a second coat following the steps above.

If you are applying Super Fast-Drying Polyurethane for Floors over ~~bare wood~~ apply a third coat, following the steps above. If this is a "screen and recoat", or if you are applying Super Fast-Drying Polyurethane for Floors over stain only two coats are required.

**Note:** Sanding is not required between coats, but for maximum smoothness, you can choose to sand before the final coat, using 220 grit sandpaper or equivalent. Allow 6-8 hours dry time before you sand. Do not sand if the film is still tacky. The product appears dark in the can, but dries clear. Floor will bear light foot traffic in 24 hours. Avoid heavy traffic, and do not install rugs or clean floors for seven days. When replacing furniture, do not slide.

If Minwax® Sanding Sealer is used prior to Super Fast-Drying Polyurethane for Floors, apply coats of Super Fast-Drying Polyurethane for Floors.

**DANGER:** Rags, steel wool, other waste soaked with this product, and sanding residue may spontaneously catch fire if improperly discarded. Immediately place rags, steel wool, other waste soaked with this product, and sanding residue in a sealed, water-filled, metal container. Dispose of in accordance with local fire regulations.

**Clean-up:** Use mineral spirits or paint thinner, following manufacturer's instructions.

**Coverage:** Approximately 600-700 square feet per gallon.

**CAUTIONS: CONTAINS ALIPHATIC HYDROCARBONS. Contents are COMBUSTIBLE.** Keep away from heat and open flame. **VAPOR-HARMFUL.** Use with adequate ventilation. To avoid overexposure, open windows and doors or use other means to ensure fresh air entry during application and drying. If you experience eye watering, headaches, or dizziness, increase fresh air, or wear respiratory protection (NIOSH approved) or leave the area. Avoid contact with eyes and skin. Wash hands after using. Keep container closed when not in use. Do not transfer contents to other containers for storage. **FIRST AID:** In case of eye contact, flush thoroughly with large amounts of water for 15 minutes and get medical attention. For skin contact, wash thoroughly with soap and water. In case of respiratory difficulty, provide fresh air and call physician. If swallowed, call Poison Control Center, hospital emergency room or physician immediately. **DELAYED EFFECTS FROM LONG-TERM OVEREXPOSURE.** Contains solvents which can cause permanent brain and nervous system damage. Intentional misuse by deliberately concentrating and inhaling the contents can be harmful or fatal. **WARNING:** This product contains chemicals known to the State of California to cause cancer and birth defects or other reproductive harm. **DO NOT TAKE INTERNALLY. KEEP OUT OF THE REACH OF CHILDREN.**

Complies with EPA rule found at 40 CFR 59: V.O.C. ≤ 350 g/L (2.9 lb/gal.). Do not thin. Nonphotochemically reactive.

**Note:** Above dry times are based on good ventilation, temperature of 77°F and 50% relative humidity. Lower temperature, higher humidity, lack of ventilation or application of thick coats will extend dry time. Slight ambering may be experienced when polyurethane is applied over light-colored wood surfaces. Always spot test on an inconspicuous area to ensure satisfactory results. For light-colored wood floors, we recommend protecting with Minwax® Ultimate Floor Finish.

This can is made from an average of 25% recycled steel—10% post consumer.
For wood finishing tips and project ideas, visit minwax.com

© 2014 MINWAX COMPANY
UPPER SADDLE RIVER, NJ 07458
1-800-523-9299
Made in the USA with global materials.

L130230000



0 27426 13023 4

6-6-19    Joshua T Hampzou



MINWAX

WATER BASED

**Polycrylic**

PROTECTIVE FINISH

DURABLE
PROTECTION
BEAUTY

Crystal Clear Finish
Ultra Fast-Drying
Easy Water Clean Up

CLEAR GLOSS

3.78 L (1 U.S. GAL.)

WARNING! VAPOR HARMFUL. IRRITATES EYES,
SKIN AND RESPIRATORY TRACT.
Before using carefully read cautions on back panel.

6-6-19   Joshua T. Hampton

# Polycrylic® Protective Finish

### For Interior Use

Minwax® Polycrylic® Protective Finish is a crystal clear, ultra fast-drying protective topcoat for use on interior wood surfaces including furniture, trim, doors and cabinets. It has little odor, cleans up easily with soap and water and can be recoated in only 2 hours.

Polycrylic® can be used over bare wood and both oil-based and water-based stains. Its clarity makes it an ideal topcoat over Minwax® Water-Based Wood Stains and light woods like maple, ash and birch. Polycrylic® also resists damage from abrasion, scuffing, chipping, water, alcohol and other common household chemicals.

## Directions

☐ **WARNING!** Removal of old paint by sanding, scraping or other means may generate dust or fumes that contain lead. Exposure to lead dust or fumes may cause brain damage or other adverse health effects, especially in children or pregnant women. Controlling exposure to lead or other hazardous substances requires the use of proper protective equipment, such as a properly fitted respirator (NIOSH approved) and proper containment and cleanup. For more information, call the National Lead Information Center at 1-800-424-LEAD (in US) or contact your local health authority.

☐ Surface must be dry and free of wax, grease, polish, old finishes in poor condition or any foreign matter.

☐ Sand to a smooth, uniform surface. DO NOT USE STEEL WOOL. Remove dust with a damp cloth. Let dry completely.

☐ If desired, apply stain such as Minwax® Water-Based Wood Stain or Minwax® Wood Finish™ to bare wood surfaces following label directions. Wait at least 24 hours before applying Polycrylic® over Minwax® Wood Finish™.

☐ Stir well before and regularly during use. DO NOT SHAKE. FINISH APPEARS MILKY IN CAN BUT DRIES CRYSTAL CLEAR.

☐ Apply a thin coat of Polycrylic® with a high-quality synthetic bristle brush. Apply in the direction of the wood grain. Do not over-brush.

☐ Let dry at least 2 hours then sand with very fine sandpaper (220 grit) to ensure an even finish and proper adhesion of additional coats. Do not use steel wool. Remove all dust.

☐ Apply second coat. For additional coats, repeat Step 6 before applying. Three coats are recommended.

☐ After final coat, allow 3 hours before light handling and 24 hours before normal use.

**Special Instructions:** Polycrylic® should not be applied over red mahogany stains. Instead, use Minwax® Fast-Drying Polyurethane or Minwax® Water Based Oil-Modified Polyurethane over any red mahogany stain. Polycrylic® is not recommended for use on floors because it would require more frequent recoating in high traffic areas. Instead, we recommend any Minwax® polyurethane, including Minwax® Water Based Oil-Modified Polyurethane or Minwax® Super Fast-Drying Polyurethane for Floors for maximum durability.

**Clean Up:** Clean with soap and warm water immediately after use.

**Coverage:** Approximately 500 sq. ft. per gallon.

**Notes:** Keep from freezing. Store below 105°F. For interior use only. Dry times are based on good ventilation, temperature of 77°F and 50% relative humidity. Lower temperature, higher humidity, lack of air movement or application of thick coats will extend drying times. Always test surface for tackiness between coats. Oil-based stains, oil-based and latex paints or other coatings applied under Polycrylic® may amber normally. Always spot test on an inconspicuous area to ensure satisfactory results.

**CAUTIONS: CONTAINS ALKYL PROPANOLS, ETHYLENE GLYCOL, GLYCOL ETHERS AND 1-METHYL-2-PYRROLIDINONE. CONTAINS MATERIAL THAT MAY CAUSE ADVERSE REPRODUCTIVE EFFECTS AND MAY ADVERSELY AFFECT THE DEVELOPING FETUS BASED ON ANIMAL DATA. VAPOR HARMFUL.** Use only with adequate ventilation. To avoid overexposure, open windows and doors or use other means to ensure fresh air entry during application and drying. If you experience eye watering, headaches or dizziness, increase fresh air or wear respiratory protection (NIOSH approved) or leave the area. Avoid contact with eyes and skin. Wash hands after using. Keep container closed when not in use. Do not transfer contents to other containers for storage. **FIRST AID:** In case of eye contact, flush thoroughly with large amounts of water for 15 minutes and get medical attention. For skin contact, wash thoroughly with soap and water. In case of respiratory difficulty, provide fresh air and call physician. If swallowed, call Poison Control Center, hospital emergency room, or physician immediately. **DELAYED EFFECTS FROM LONG-TERM OVEREXPOSURE.** Contains solvents which can cause permanent brain and nervous system damage. Intentional misuse by deliberately concentrating and inhaling the contents may be harmful or fatal. **WARNING:** This product contains chemicals known to the State of California to cause cancer and birth defects or other reproductive harm.

**DO NOT TAKE INTERNALLY. KEEP OUT OF REACH OF CHILDREN. CONFORMS TO ASTM D-4236.** Contact a physician for more health information.

Max V.O.C. 2.3 lb/gal (275 g/L). Nonphotochemically reactive. Do not thin.

**For Wood Substrates Only**

For questions or comments, please call:
1-800-523-9299 Mon.-Fri. 8:00 AM-5:00 PM EST
For wood finishing tips and project ideas
visit minwax.com

©2011 MINWAX COMPANY
Upper Saddle River, NJ 07458
Made and Printed in the U.S.A.

L155550D0G



0   27426 15555   8



Hampton Joshua 31575-160
Federal Inst Corrections
26680 Hwy 301 South
Jesup GA 31599

RECEIVED
SCRANTON

JUL 12 2019

PER ___ DEPUTY CLERK

⇔315

Legal Mail